# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

ROBERT CHENAULT,

    Plaintiff,

vs.

THE DAYTON VIEW ACADEMY, *et al.*,

    Defendants.

Case No. 3:11-cv-49

Judge Timothy S. Black

## ORDER THAT: (1) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 17) IS GRANTED; AND (2) THIS CASE IS CLOSED

This civil action is before the Court on Defendants' motion for summary judgment. (Doc. 17). Plaintiff did not respond.

## I. BACKGROUND

On September 20, 2011, Defendants filed a motion for summary judgment on Plaintiff's seven-count complaint. (Doc. 17). After missing the deadline to respond, Plaintiff was ordered to show cause why the motion for summary judgment should not be granted. (Doc. 18). Rather than responding to the Court on the merits of the motion or identifying any supporting evidence that might preclude summary judgment, Plaintiff instead seeks voluntary dismissal without prejudice pursuant to Fed. R. Civ. P. 41(a)(2). (Doc. 19). Plaintiff states that "he has not been able to obtain gainful employment" and "does not reasonably anticipate that he will be in a position to finance this matter in the

near future." (*Id.*)[1]

## II. UNDISPUTED FACTS[2]

**Parties**

1. The Dayton View Academy ("DVA" or "the School") is a public school in Dayton, Ohio that operates pursuant to a Charter granted to the School's Board of Trustees ("Board") by the Ohio State Board of Education. Deposition of Amy Doerman ("Doerman Depo.") (Doc. 17, Ex. B at 28-29).

2. EdisonLearning, Inc. (formerly Edison Schools Inc.) manages DVA in accordance with a management agreement between the Board and EdisonLearning. (*Id.* at 28-29, 131).

3. Amy Doerman, the Principal at DVA, is Caucasian. (Chenault Depo. at 75).

4. Plaintiff Robert Chenault is Caucasian. (Doc. 3 at ¶ 71).

**Plaintiff's Hiring, At-Will Status, and Integrated Employment Contract**

5. In June 2008, plaintiff applied for a teaching position at DVA. Plaintiff completed and signed a written employment application. Deposition of Robert Chenault ("Chenault Depo."). The application included the following provision:

I understand that this application for employment is not a contract and is not intended to confer or create contractual rights of any kind or nature. If employed, employment is on an at-will basis and may be terminated at any time and for any reason, with or without cause, by either the employee or Edison Schools, Inc., unless I and an authorized officer of Edison Schools, Inc. have signed a separate

---

[1] Defendants argue that Plaintiff's unemployment situation has been evidenced for months, because at his deposition on August 2, 2011, two months before the dispositive motion deadline, Plaintiff testified that both he and his wife were unemployed and that they had moved in with his mother-in-law.

[2] These are Defendants' undisputed facts taken from their motion for summary judgment. (Doc. 17). Plaintiff failed to respond to the motion for summary judgment and, accordingly, the Court accepts Defendants' undisputed facts as true.

written contract to the contrary.

> (Chenault Depo. at 211 and Ex. 42, at 6). By signing the application, plaintiff expressly agreed to the at-will condition of his employment. (*Id.*)

6. After plaintiff submitted his application and interviewed with Ms. Doerman and other DVA administrators and personnel, Ms. Doerman extended an offer of employment to plaintiff as a middle school science teacher. (Chenault Depo. at 16, 123 and Ex. 1).

7. On June 23, 2008, plaintiff signed an employment agreement with the DVA Board of Directors, which set out the terms and conditions of his employment for the 2008-2009 school year. (Chenault Depo. at 53-54 and Ex. 2). In signing the agreement, plaintiff understood that he was responsible for meeting the expectations and standards outlined in the job description for his position, which was attached to the agreement. (Chenault Depo. Ex. 2, at 1).

Additionally, Section 8 of the agreement that plaintiff signed, entitled "AT-WILL EMPLOYMENT," stated that:

The parties acknowledge and agree that the Employee's employment with the School is at-will, meaning that the Employee is not guaranteed employment for any fixed or definite length of time and that either party is free to terminate the employment relationship at any time for any reason, with or without cause or advance notice, except as expressly limited by the provisions contained in section 7 of this agreement. The parties further acknowledge and agree that the Employee's status as an at-will employee may not be modified or superseded, except by a written agreement signed by the Employee and the School Board with proper approval by EdisonLearning.

> (Chenault Depo. at 67-68 and Ex. 2 at 3).

8. Plaintiff's employment agreement also contained the following provision: This agreement shall constitute the entire understanding of the parties with respect to the subject matter herein and supersedes all prior agreements and understandings, written or oral, between the parties with respect to such subject matter and may only be altered, changed, added to, deleted from or modified through the voluntary, mutual consent of the parties in a written and signed amendment to this agreement. (Chenault Depo. Ex. 2 at 4).

-3-

9. Plaintiff began working at DVA on July 30, 2008. (Chenault Depo. at 74). He was responsible for teaching two seventh and eighth grade science classes in the morning and two classes in the afternoon. (*Id.* at 90).

10. While employed with DVA, plaintiff received funding from a transition-to teaching program known as Project KNOTT, in partnership with the Fordham Foundation, to pursue graduate level courses in education toward his alternative certification. (Chenault Depo. at 68-69).

11. At the outset of his employment, plaintiff received a number of documents relating to the operations of DVA and his responsibilities as an employee. One such document was a Code of Ethics and Standards of Conduct ("Code and Standards") that described various policies and procedures of EdisonLearning. (Chenault Depo. at 124 and Ex. 5). Plaintiff acknowledged receipt of the Code and Standards on August 1, 2008, along with his understanding that the Code and Standards do not constitute a guarantee of employment. *Id.*

12. Plaintiff also received Employee Handbooks for each academic year in which he worked at DVA. Similar to the other documents provided to plaintiff, the "Introduction" section of the Employee Handbook included a provision reiterating plaintiff's at-will status, explaining that "[t]his means neither you nor the School has entered into a contract regarding the duration of your employment or the reasons necessary for the termination of the employment relationship." (Chenault Depo. at 125-28, Exs. 6, 8). Plaintiff signed acknowledgment forms upon receiving the Employee Handbooks, agreeing "that no other communication from the School or EdisonLearning shall constitute a contract of employment for any specified duration or alter the 'at-will' nature of employment." (*Id.*, Ex. 7).

### Plaintiff's Employment and Performance Issues

13. Before beginning the 2008-2009 academic school year, plaintiff attended the Chicago Teaching Academy, a three-day EdisonLearning training seminar. (Chenault Depo. at 17). Plaintiff received training on various topics, ranging from how to create and maintain a positive learning environment to curriculum-specific subjects. (Doerman Depo. at 73-74). Ms. Doerman loaned plaintiff money for meals and other ancillary expenses so that he could attend this seminar. (Chenault Depo. at 43-44, 50-51).

14. While working for DVA, plaintiff was assigned to a team of other middle school teachers who frequently met during professional development periods that were built into the school day. (Chenault Depo. at 18-20; Doerman Depo. at 36, 79). The team meetings often focused on handling discipline or dealing with individual student needs and were facilitated by a Lead Teacher, who also served as a coach and mentor to plaintiff. (Chenault Depo. at 27-29, 140; Doerman Depo. at 39, 79-80).

15. Plaintiff's Lead Teacher, Channey Goode, and his co-worker, Teacher Marcey Robinson, were especially helpful in assisting plaintiff with handling particular students. (Chenault Depo. at 24-25).

16. During days on which his team did not meet, plaintiff was given free periods to work on individual professional development. (Chenault Depo. at 17-18).

17. In addition, DVA set aside days for plaintiff and other teachers throughout the course of the school year dedicated solely to professional development. (Chenault Depo. at 51-52, 74-75; see, e.g., Chenault Depo. Ex. 6, Appendix 1–Dayton Leadership Academies Local Handbook at 72 (academic calendar showing at least 10 full professional development days scheduled during the 2009-10 year)).

18. Plaintiff attended professional development and training seminars at the start of each school year that centered on certain topics, such as learning environment, techniques and strategies in teaching lesson plans, communicating kid-friendly objectives and standards, achieving student engagement, and effective use of the print environment. (Doerman Depo. at 69-70, 75-77).

19. DVA's Academy Director, Basharus Simmons, assisted and coached plaintiff on classroom management skills. (Chenault Depo. at 21-22; Doerman Depo. at 78). Plaintiff felt that Mr. Simmons was "truly supportive" when he instructed plaintiff on Bloom's Taxonomy and counseled plaintiff about the criteria on which he would be evaluated. (Chenault Depo. at 233).

20. Curriculum coordinators were also available to address instructional management issues, provide supplies, and attend to any other matters on which plaintiff needed help. (Chenault Depo. at 169-70; Doerman Depo. at 36).

21. On September 9, 2008, Ms. Doerman conducted an informal observation in plaintiff's classroom. (Chenault Depo., Ex. 14). Plaintiff agrees with all of the items noted during this observation, including the following: he tolerated too many interruptions, allowing his class to run off task; he failed to post standards and an agenda on the board; he did not make the purpose and expectations of the day's lessons clear; and he casually and inappropriately referenced one of the students as "Hollywood." (Chenault Depo. at 131-34 and Ex. 14).

22. Ms. Doerman met with plaintiff to cover the evaluation and advised him to confer with Lead Teacher Mr. Goode about techniques to minimize wasted time during the class period, which plaintiff did and found to be helpful. (Chenault Depo. at 131-34; Doerman Depo. at 94-95).

23. On October 6, 2008, following performance discussions and coaching sessions between plaintiff, Mr. Simmons and Mr. Goode, plaintiff was issued a performance improvement plan ("PIP"). (Chenault Depo., Ex. 15). The PIP was a result of plaintiff's failure to demonstrate consistent, sustained improvement in the following critical areas:

   • Posting clear, focused objectives tied directly to the students' learning.
   • Maximizing his instructional time through the effective use of "Do Nows."
   • Actively teaching and monitoring, rather than sitting at his desk on the computer.
   • Enhancing the print environment by posting student work and displays connected to the current unit of study.
   • Submitting lesson plans on time.
   • Conducting and overseeing experiments specific to the science curriculum.
   • Consistently administering discipline, as it was specifically noted that plaintiff was observed on several occasions ignoring a behavior until an administrator entered the room. *Id.*

24. As stated in the PIP, plaintiff agreed that the goal of Ms. Doerman, Mr. Simmons and Mr. Goode was to ensure a positive, structured learning environment and successful academic achievement. (Chenault Depo. at 134-39 and Ex. 15). Plaintiff further agreed that all of the areas of improvement addressed in the PIP were important in achieving this important goal. (*Id.*)

-6-

25. Ms. Doerman advised plaintiff in the PIP that "[t]hese items that we have listed are expectations of all Dayton View Academy staff members, and we are here to help you succeed. If there is anything you need, please do not hesitate to let us know." (Chenault Depo., Ex. 15 at 2). Plaintiff told Mr. Simmons at this time that he might benefit from having a mentor. (*Id.* at 140).

26. Ms. Doerman completed school-wide informal observation forms for plaintiff on October 15, 2008 and October 31, 2008, one of which expressly noted plaintiff's improvement in the areas of academic focus and student engagement. (Chenault Depo., Exs. 16-17).

27. Administrators at DVA have different methods for conducting observations of teachers. Sometimes evaluators make their presence known and sit in the classroom, and other times they observe the classroom from the doorway or hallway. (Doerman Depo. at 44). Plaintiff does not know one way or the other whether Ms. Doerman or anyone else observed his class from the hallway. (Chenault Depo. at 141-42). Plaintiff recalls seeing Mr. Simmons sitting outside his classroom in the hallway on one occasion, and plaintiff estimates that Mr. Simmons visited his classroom to observe approximately seven times during his employment. (*Id.* at 142, 145).

28. On November 4, 2008, Ms. Doerman filled out a second informal observation form for plaintiff, giving him generally positive comments. (Chenault Depo. at 76, 145-46 and Ex. 18).

29. Following the 2008 PIP, plaintiff demonstrated improved performance and, as a result, his employment was renewed for the 2009-10 school year. (Doerman Depo. at 134, 157).

### Plaintiff's Ongoing Performance Issues and His Second Performance Improvement Plan

30. On April 30, 2009, plaintiff signed an employment agreement for the 2009-2010 school year, which was similar in all material respects to the agreement he signed the previous year, including the at-will language and the integration clause. (Chenault Depo. at 53 and Ex. 3; *see* Statement of Facts ("Facts") ¶¶ 7-8, *supra*, at 3).

-7-

31. Shortly after the start of the 2009-2010 school year, plaintiff met with Ms. Doerman, Mr. Simmons, and Ms. Robinson to discuss potential areas of improvement in plaintiff's performance. (Chenault Depo. at 153-54). Various areas of concern were addressed with plaintiff, including his unsatisfactory classroom management skills – one of the same deficiencies noted in his PIP from the previous year. (*Id.* at 154-55, Ex. 25).

32. On September 8, 2009, Ms. Doerman observed plaintiff's classroom and graded him as ineffective in several areas of performance, including student engagement and bell-to-bell instruction (*i.e.* efficient use of class time). (Chenault Depo., Ex. 26).

33. More than one month later, Ms. Doerman conducted an individual observation of plaintiff, noting some of the same inadequacies in plaintiff's classroom instruction. She noted that rather than maximizing instructional time, plaintiff's instruction resulted in down time and wasted minutes. (Chenault Depo. Ex. 27; *see also* Doerman Depo. at 87-89) (defining the performance categories in the Power of Teaching evaluation form). The evaluation form indicates that plaintiff was not focusing on student-centered work or cooperative learning, and instead, the majority of his assignments consisted of unproductive remediation or busy work. (*Id.*) Ms. Doerman also documented that plaintiff continued to fail to achieve effective student engagement. (*Id.*)

34. As a result of his ongoing performance issues, plaintiff was issued a second PIP on November 5, 2009. (Chenault Depo., Ex. 28). The PIP highlighted three primary performance concerns:

• Active teaching and monitoring of the class – plaintiff was observed sitting at his desk working on his laptop while students engaged in off-task behaviors; rather than engaging in teacher-led instruction and hands-on science projects, students were given down time and time to talk.

• Planning, preparing and delivering engaging, data-driven, hands-on instruction – plaintiff was not using the science curriculum and all school-provided resources to lead students in hands-on instruction and experiments.

• Consistent classroom management – students were observed entering and exiting plaintiff's classroom during instructional periods, and there was excessive noise coming from plaintiff's classroom. *Id.*

-8-

35. Plaintiff met with Ms. Doerman and Mr. Simmons to discuss the performance standards expectations as outlined in the PIP, as well as the resources plaintiff was to use and follow, in order to maintain consistent improvement in all areas. (Chenault Depo. at 159-61 and Ex. 28).

36. Days after plaintiff had received the second PIP, one of plaintiff's students approached Ms. Doerman asking for "something to do." (Chenault Depo. Ex. 30). Ms. Doerman reiterated to plaintiff that there should be no down time during instructional periods, and that plaintiff's failure to provide meaningful, science-related work to students was contrary to the terms of his PIP. (*Id.*)

37. Plaintiff was scheduled to meet with Ms. Doerman and Mr. Simmons on December 10, 2009 for a follow-up coaching session regarding the items outlined in the PIP and to discuss plaintiff's progress. As the meeting was set to start, plaintiff requested to reschedule for a time when a member of human resources would be available to attend. (Chenault Depo. at 181-85). Mr. Simmons explained that the issues were instructional and the meeting needed to proceed with or without plaintiff's representation, but plaintiff continued to insist on rescheduling the meeting. (*Id.* at 181-85 and Ex. 32).

38. On the following day, plaintiff was notified of additional issues that had arisen since his second PIP, including: concerns on behalf of staff, students and parents that plaintiff was telling inappropriate "your mama" jokes during class; failure to follow school protocol as directed during previous performance meetings; and staff and student concerns about the level of aggression plaintiff exhibited when confronting certain students about their behavior. (Chenault Depo. at 188, 191-94 and Ex. 33). Plaintiff was advised that because he failed to adequately address ongoing performance concerns, his employment was terminated effective December 11, 2009. (*Id.* at 188, 191-94 and Exs. 33-34).

**Events Following Plaintiff's Termination from DVA**

39. On or around December 18, 2009, plaintiff received a letter from Ms. Doerman advising him that DVA had received complaints from parents about plaintiff's contact with students on Facebook. (Chenault Depo. at 198 and Ex. 36). Ms. Doerman requested that plaintiff cease any such contact immediately. (*Id.*)

-9-

40. Plaintiff admits that he stayed in touch with students on Facebook, and that he communicated with "many" students on Facebook about the reasons he was no longer employed at DVA. (Chenault Depo. at 200).

41. Following his termination, plaintiff was asked not to exit his vehicle and interact with students on school grounds when picking up his wife, who also worked at DVA. (Chenault Depo. at 204-05). On one occasion, a police officer had to escort plaintiff off the school property. (*Id.* at 206).

42. Plaintiff alleges that almost one year after he stopped working at DVA, Ms. Robinson, a teacher/former co-worker, who is Caucasian, stated to four students on one occasion that plaintiff "likes to touch children." (Chenault Depo. at 30-33). Plaintiff has no idea why his former co-worker made such a statement. (*Id.* at 36, 38).

43. The teacher who was hired in plaintiff's former position is Caucasian. (Chenault Depo. at 94-95).

44. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about August 21, 2010, which included allegations of race and sex discrimination. Plaintiff stated in his deposition that he filed the Charge because he "was the only white male teacher in the building." (Chenault Depo. at 207-08, Ex. 40).

45. The EEOC dismissed plaintiff's Charge and issued a right-to-sue notice on September 17, 2010, which plaintiff admits to receiving in the mail on or about that date. (Chenault Depo. at 208, Ex. 41). Plaintiff filed the instant lawsuit on January 19, 2011. *See* Complaint.

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of

genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV. ANALYSIS

Plaintiff's failure to respond to Defendants' motion for summary judgment warrants summary judgment for the Defendants.[3] Moreover, summary judgment is also warranted on the merits. *See Guarino v. Brookfield Twp. Tr.*, 980 F.2d 399, 404-05 (6th Cir. 1992) (holding that a district court properly relies upon the facts provided by a moving party when a motion for summary judgment goes unopposed).

### A. Reverse Race and Hostile Work Environment Claims

A plaintiff alleging violations under Title VII must file a complaint within ninety days of receiving the EEOC's right-to-sue notice. *Brown v. Hyperion Seating Corp.*, No. 98-6373, 1999 U.S. App. LEXIS 24305, at *6-7 (6th Cir. 1999). Failure to bring suit within ninety-days is grounds for dismissal. *McKibben v. Hamilton County*, No. 99-3360, 2000 U.S. App. LEXIS 12123, at *8 (6th Cir. 2000).

---

[3] Additionally, dismissal is warranted pursuant to Fed. R. Civ. P. 41(b) for Plaintiff's failure to prosecute.

The EEOC mailed its right-to-sue notice to Plaintiff on September 17, 2010. (Fact ¶ 45). Plaintiff admits that he received the EEOC's notice in the mail, and he is presumed to have received it on September 22, 2010, at the latest, because the Sixth Circuit has established that a plaintiff is assumed to have received a right-to-sue notice five days after it is mailed. *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 (6th Cir. 2000). Therefore, Plaintiff was required to file this lawsuit on or before December 21, 2010, but did not file his complaint until January 19, 2011. Accordingly, Plaintiff's Title VII claims are time-barred.

### B. Contract Based Claims

Plaintiff alleges that Defendants breached his 2009-2010 employment agreement by violating an obligation to act in good faith in evaluating him as a first-time teacher, and then by ultimately terminating him. In order to sustain a breach of contract claim, Plaintiff must establish a right to continued employment. Here, the evidence establishes that Plaintiff was an at-will employee. (*See* Fact ¶¶ 7, 5, 11-12). Plaintiff's assertion that Defendants had an obligation to evaluate his performance in "good faith" has no support in any language in his agreement. Accordingly, his breach of contract claim is without merit.

### C. Defamation

In order to proceed on a defamation claim, Plaintiff must establish: (1) a false and defamatory statement about him; (2) published without privilege to a third party; (3) with

fault or at least negligence on the part of defendants; and (4) that was either defamatory per se or caused special harm to plaintiff. *Gosden v. Louis*, 687 N.E.2d 481, 488 (Ohio Ct. App. 1996). Plaintiff's claim fails because he cannot demonstrate that Defendants made the alleged defamatory statement. Moreover, even accepting Plaintiff's allegation as true, the teacher/co-worker was not acting within the scope of her employment at the time the alleged disparaging statement regarding plaintiff was made. *See, e.g., Byrd v. Faber*, 565 N.E.2d 584 (1991) (An "intentional and willful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from employment and the principle or employer is not responsible therefor.").

Accordingly, Plaintiff's claim for defamation fails as a matter of law.

### D. Intentional Infliction of Emotional Distress

Plaintiff alleges that Ms. Doerman and Mr. Simmons caused him emotional distress by failing to provide a mentor from whom he could seek guidance on his repeated struggles in the classroom. (Chenault Depo. at 44-45). To establish a claim for intentional infliction of emotional distress, a plaintiff must provide four essential elements: (1) that the actor either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to the plaintiff; (2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered "utterly intolerable in a civilized community"; (3) that the actor's actions were the proximate cause of

plaintiff's psychic injury; and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that "no reasonable man could be expected to endure it." *Hanley Riverside Methodist Hosp.*, 603 N.E.2d 1126, 1132 (Ohio App. 1991). Plaintiff has failed to meet the heavy burden Ohio courts require to establish a claim for IIED, as Plaintiff has not produced any facts that continue extreme and outrageous conduct.

## V. CONCLUSION

Based on the evidence of record, this Court finds that Defendants' motion for summary judgment is well taken as there are no genuine issues of material fact in dispute and Defendants are entitled to entry of judgment as a matter of law. Accordingly:

1. Defendants' motion for summary judgment (Doc. 17) is hereby **GRANTED**; and

2. This case is **CLOSED**.

**IT IS SO ORDERED.**

Date: 11/15/11

Timothy S. Black
United States District Judge